Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/18/2020 08:24 AM CST

Jayson H. Tilson, appellant, v. Erica M. Tilson,
appellee, and Kimberly L. Hill,
intervenor-appellee.

___ N.W.2d ___

Filed September 25, 2020.    No. S-19-344.

1. **Judgments: Jurisdiction: Appeal and Error.** A jurisdictional question
   that does not involve a factual dispute is determined by an appellate
   court as a matter of law, which requires the appellate court to reach a
   conclusion independent of the lower court's decision.
2. **Judges: Recusal: Appeal and Error.** A motion requesting a judge to
   recuse himself or herself on the ground of bias or prejudice is addressed
   to the discretion of the judge, and an order overruling such a motion will
   be affirmed on appeal unless the record establishes bias or prejudice as a
   matter of law.
3. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules
   apply, the admissibility of evidence is controlled by such rules; judicial
   discretion is involved only when the rules make discretion a factor in
   determining admissibility.
4. **Trial: Evidence: Appeal and Error.** A trial court has the discretion to
   determine the relevancy and admissibility of evidence, and such deter-
   minations will not be disturbed on appeal unless they constitute an abuse
   of that discretion.
5. **Rules of Evidence: Hearsay: Appeal and Error.** Apart from rulings
   under the residual hearsay exception, an appellate court reviews for clear
   error the factual findings underpinning a trial court's hearsay ruling and
   reviews de novo the court's ultimate determination to admit evidence
   over a hearsay objection or exclude evidence on hearsay grounds.
6. **Modification of Decree: Appeal and Error.** Modification of a dis-
   solution decree is a matter entrusted to the discretion of the trial court,
   whose order is reviewed de novo on the record, and will be affirmed
   absent an abuse of discretion by the trial court.

7. **Evidence: Appeal and Error.** In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.

8. **Modification of Decree: Attorney Fees: Appeal and Error.** In an action for modification of a marital dissolution decree, the award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion.

9. **Judges: Recusal.** A judge should recuse himself or herself when a litigant demonstrates that a reasonable person who knew the circumstances of the case would question the judge's impartiality under an objective standard of reasonableness, even though no actual bias or prejudice was shown.

10. **Judges: Recusal: Presumptions.** A party alleging that a judge acted with bias or prejudice bears a heavy burden of overcoming the presumption of judicial impartiality.

11. **Judges: Recusal.** Opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.

12. **Appeal and Error.** To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error.

13. **Rules of Evidence: Hearsay: Proof.** In order for statements to be admissible under Neb. Evid. R. 803(3), Neb. Rev. Stat. § 27-803(3) (Reissue 2016), the party seeking to introduce the evidence must demonstrate (1) that the circumstances under which the statements were made were such that the declarant's purpose in making the statements was to assist in the provision of medical diagnosis or treatment and (2) that the statements were of a nature reasonably pertinent to medical diagnosis or treatment by a medical professional.

14. **Rules of Evidence: Medical Assistance: Health Care Providers.** Neb. Evid. R. 803(3), Neb. Rev. Stat. § 27-803(3) (Reissue 2016), applies to persons seeking medical assistance from persons who are expected to provide some form of health care.

15. **Modification of Decree: Child Custody: Proof.** Ordinarily, custody of a minor child will not be modified unless there has been a material

change in circumstances showing either that the custodial parent is unfit or that the best interests of the child require such action.

16. **Parent and Child: Words and Phrases.** Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being.

17. **Modification of Decree: Visitation.** Visitation rights established by a marital dissolution decree may be modified upon a showing of a material change of circumstances affecting the best interests of the children.

18. **Modification of Decree: Words and Phrases.** A material change in circumstances means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently.

19. **Modification of Decree: Visitation: Proof.** The party seeking to modify visitation has the burden to show a material change in circumstances affecting the best interests of the child.

20. **Modification of Decree: Visitation.** The best interests of the children are primary and paramount considerations in determining and modifying visitation rights.

21. **Modification of Decree: Child Support: Proof.** A party seeking to modify a child support order must show a material change in circumstances that (1) occurred subsequent to the entry of the original decree or previous modification and (2) was not contemplated when the decree was entered.

Appeal from the District Court for Lancaster County: ROBERT R. OTTE, Judge. Affirmed.

Matt Catlett, of Law Office of Matt Catlett, for appellant.

David P. Kyker for intervenor-appellee.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

PAPIK, J.

Jayson H. Tilson appeals a district court order modifying the decree that dissolved his marriage. The district court rejected Jayson's argument that the original decree was void. It ordered that custody of Jayson's three children should remain with the children's maternal grandmother, but modified the decree

as to parenting time and child support. On appeal, Jayson primarily argues that because, several years ago, he filed a motion to dismiss his complaint for dissolution, the decree of dissolution that followed was void, even though he withdrew the motion to dismiss hours after he filed it. In the alternative, Jayson challenges admissibility rulings at the modification hearing and the modification order's custody, parenting time, child support, and attorney fees determinations, as well as the denial of his motion to disqualify the presiding judge. We find no merit to Jayson's claims, and we affirm.

## BACKGROUND

*Motion to Dismiss and Dissolution Decree.*

In September 2014, Jayson filed a complaint for dissolution of his marriage to Erica M. Tilson, who has been incarcerated and is not involved in the current appeal. In December 2014, temporary custody of the couple's three minor children was awarded to the maternal grandmother, Kimberly L. Hill (Kimberly). The court subsequently allowed Kimberly to intervene and appointed a guardian ad litem for the children. In August 2015, Kimberly and her husband filed a third-party complaint, asking for grandparent visitation and continued temporary custody of the children.

On November 16, 2015, the day before a scheduled dissolution hearing, Jayson filed a motion to dismiss his complaint for dissolution. The dissolution hearing was held as scheduled on November 17, with Jayson in attendance.

On December 8, 2015, the court entered a decree of dissolution, drafted by Jayson's counsel. Referring to the November 17 hearing, the decree stated, "Upon motion of [Jayson's] attorney . . . [Jayson's] motion to dismiss is withdrawn." The decree ordered the continuation of Kimberly's legal and physical custody, and as to Jayson, it ordered parenting time and a contribution toward childcare expenses. Jayson was not ordered to pay child support. The decree prohibited Jayson from consuming alcohol within 24 hours prior to or during his parenting time and ordered him to administer the children's

prescribed medications during his parenting time. Erica was ordered to pay child support and was awarded supervised parenting time by arrangement.

*Jayson's February 24, 2017, "Complaint," Initial
Appeal, and Motion for Judicial Disqualification.*

More than a year after the entry of the decree, on February 24, 2017, Jayson filed a "Complaint." Relevant here, the complaint requested (1) that the decree be vacated as void because his November 2015 motion to dismiss was self-executing, and thus the court lacked jurisdiction to enter the decree, and (2) that in the alternative, the decree be modified to place custody of the children with him. In an answer and cross-complaint, Kimberly asked that Jayson's weekly parenting time be reduced and "fully supervised." She also requested child support.

Before any ruling on Jayson's complaint filed February 24, 2017, Jayson filed additional motions upon which the district court ruled, and Jayson appealed. We dismissed the appeal. See *Tilson v. Tilson*, 299 Neb. 64, 907 N.W.2d 31 (2018). We concluded that the ruling appealed from was not a final order because it did nothing more than deny requests for temporary relief and preserve the status quo pending the determination of other issues. *Id.*

On May 5, 2018, Jayson filed a motion for judicial disqualification. As discussed in more detail below, he alleged several ways in which the presiding judge had exhibited bias. Following a hearing, the district court overruled the motion.

*Trial Addressing February 24, 2017, "Complaint."*

The district court held a trial on Jayson's February 24, 2017, complaint. At trial, Kimberly testified that she is the maternal grandmother of the children: M.T., born in 2007; R.T., born in 2012; and T.T., born in 2013. The children had lived with Kimberly and her husband since December 2014, after Jayson was ticketed for leaving them home alone while he was out drinking at a bar. According to Kimberly, until

March 2017, Jayson did not exercise all of his allotted parenting time. Kimberly's testimony generally showed that while the children were with her, she took care of all their needs, including food, clothing, bathing, medical appointments and prescriptions, counseling, help with schoolwork, and extracurricular activities.

Kimberly testified that she had many concerns about the children's safety when they were with Jayson. She estimated that she observed the children improperly restrained in Jayson's vehicle 20 times during the year preceding trial and 50 times overall, despite talking to Jayson about the issue multiple times. Kimberly testified that she was also concerned that Jayson did not give the children their medication consistently, in particular, an antidepressant that M.T. used in 2015 and 2016. She testified about various dog and cat scratches the children had received while under Jayson's care. Kimberly acknowledged that Jayson had been good about taking the children "to the lake and to the park," but testified he was not good about supervising them while swimming. As a result, M.T.'s glasses had been lost and broken, and the two younger children had gone beyond where they should safely be in the water and without lifejackets. Kimberly testified that nearly every time the children returned from these outings, they had been "fried" by the sun.

Kimberly had concerns about clothing, cleanliness, and food during the children's time with Jayson. In late 2015 or early 2016, while Jayson was living at his previous residence, Kimberly saw cockroaches in M.T.'s school backpack. Kimberly testified that starting in the summer of 2017, the children had lice for a 4-month period and had not had lice when they left to visit Jayson. She testified that in the year before trial, the children consistently returned from visits with Jayson extremely dirty and dressed in clothes that were the wrong size or inappropriate for the weather. Kimberly also stated that over the preceding 3½ years, the children usually returned from Jayson's home hungry.

Kimberly also expressed concerns about the effect Jayson's parenting time had on the children's behavior and school performance. She testified that the children were not doing their homework while at Jayson's home. Kimberly testified that after Jayson's overnight parenting time was suspended in March 2018, the children's behavior improved. Before, M.T. was having urinary accidents about four times a year, but since the change in visitation, she had not had any. Similarly, when the two younger children were staying with Jayson overnight, they misbehaved for 2 days afterward, but since March 2018, any misbehavior had been short lived and their school performance had improved.

The children's guardian ad litem, Candice Wooster, testified about her investigation in this case. Wooster was not able to schedule a visit at Jayson's home and has never been informed where he lives. She testified that she spoke to Jayson by telephone a handful of times between December 2015 and May 2017. During one call, Jayson hung up on Wooster. In May 2017, Jayson stopped returning her calls. As a result, Wooster was unable to arrange a home visit with Jayson. She also contacted his attorney and asked if he would like to be present at a home visit, but this did not result in an opportunity to either speak with Jayson or visit his home. Wooster testified that at a hearing during the 3- or 4-month period preceding trial, Jayson's counsel submitted an affidavit in which Jayson stated he would not be speaking to Wooster.

In contrast, Wooster visited Kimberly's home four or five times for an hour and found no concerns. Wooster observed a very loving relationship between Kimberly and the children. She saw Kimberly helping the children with their homework. When R.T. had a tantrum, Kimberly calmly helped her through it. She also observed Kimberly's husband playing with the children.

Dr. Judith Bothern, a licensed psychologist, testified that she provided therapy for M.T., R.T., and T.T. from December 2015 until November 2017. Bothern testified that Kimberly

initiated this therapy. M.T., who had 89 sessions with Bothern, was Bothern's primary client in the family. Bothern diagnosed M.T. with adjustment disorder and major depressive disorder. Bothern's treatment plan for M.T. included addressing her relationship with Jayson and his knowledge of parenting practices. Pursuant to a court order, Jayson participated in 18 sessions starting around the same time as the children and continuing until September 2016.

Bothern testified regarding several safety concerns about Jayson's care for M.T. M.T. told her that Jayson did not regularly give M.T. her antidepressant medication, which, according to Bothern, could have a significant effect on M.T.'s ability to modulate her moods, emotions, and behavior. M.T. reported to Bothern that sometimes when she reminded Jayson about her medication, he would tell her she had already taken it, when she had not. Bothern testified, however, that Jayson recognized the need to be more consistent with the medication and expressed an intention to make greater efforts.

Bothern testified that she was also concerned about the children's physical safety. In April 2017, R.T. presented with a bruise on her forehead and T.T. presented with bruises on her chest and her leg, apparently caused by Jayson's shooting them with a "Nerf" gun. Bothern testified that this made her concerned that Jayson had poor judgment about what was appropriate with the children. In addition, during her last session, M.T. told Bothern that Jayson used a pellet gun to shoot the children for "'fun.'" As a result, Bothern filed a report with Child Protective Services (CPS).

Bothern had concerns relating to Jayson's living situations. Bothern testified that early on during Jayson's participation, he acknowledged that his residence at that time was in disrepair and had "trouble with mice and bugs," but he claimed he was doing what he could to handle the issue. In early 2016, Jayson's living situation resulted in five or six children, including older boys and younger girls, sharing a bedroom. M.T. reported being very concerned because in the bedroom

the boys would expose themselves to her and had touched the genitals of a female child living in the home, who was about 3 years old at the time. Bothern filed a CPS report as a result. M.T. also had concerns that the boys were "barging in on her in the bathroom." When Bothern discussed these things with Jayson, he said he would show M.T. how to lock the bathroom door. But with regard to the incidents in the bedroom, Bothern said Jayson responded with a "boys will be boys type of thing."

Jayson subsequently moved in to the residence of Lexi Wallen, where the three children shared a bedroom with Wallen's daughter. In September 2017, M.T., R.T., T.T., and Wallen's daughter, who was approximately 6 years old at the time, left that residence in the middle of the night and were returned home by the police. M.T. told Bothern they left because their bedroom smelled like urine, there was a moldy hole in the wall, and ants were all over. In her last session, M.T. told Bothern that there were three mice in the residence, which Jayson shot at with a pellet gun.

Bothern testified that she was concerned that Jayson had told M.T. not to tell Kimberly about events in Jayson's home. When Bothern reported things M.T. had told her to Jayson, Jayson would often subject M.T. to "some backlash." When Bothern spoke to Jayson about the matter in therapy, he told M.T. that she could talk to Bothern about anything. But when Jayson stopped participating in therapy, M.T. reported that Jayson had told her not to tell Kimberly about certain incidents. M.T. struggled with this because it required her to either lie to Kimberly or betray Jayson. And in June 2017, M.T., then about 9 years old, reported to Bothern that CPS came to Jayson's home with the police because R.T. had reported to someone that Jayson had left the children home alone. When Jayson got very angry with M.T. over this, she falsely told CPS and the police it never happened. Additionally, Bothern testified that many times throughout treatment, the children told her that Jayson instructed them to misbehave while in Kimberly's care. This too caused emotional distress for M.T.

Bothern testified that she was also concerned about supervision being delegated to M.T. For example, Bothern recounted that in the spring of 2016, T.T. had incurred a bad scrape on her face from falling off a retaining wall while under M.T.'s supervision. Bothern testified that around the same time, M.T. had been "terrified" during a swimming outing when a 4-year-old child in their group fell into the water and M.T. felt responsible for bringing her to safety. In October 2017, M.T., then about age 9, reported that Jayson told her it was her responsibility to take care of her 1- or 2-month-old brother while Jayson and a friend were drinking beer in the home and Wallen was away. Bothern further testified that once in her clinic, she observed Jayson instruct M.T. to take the younger children to the bathroom and also observed Jayson instruct M.T. to retrieve the younger children when they went into the toy room without an adult; in Bothern's view, these were "[i]nappropriate" expectations to be placing on M.T. at her level of development.

Bothern testified that she never performed a psychological evaluation on Jayson. Rather, she tried to work with Jayson to understand M.T.'s developmental needs and expectations, along with appropriate discipline and parenting. Bothern characterized Jayson as "very easy to work with"; he always responded well in the clinic and was respectful. Bothern testified that Jayson improved in identifying problem areas, but "not so much in follow through." In Jayson's later sessions, Bothern observed that he was frequently not following through on her recommendations about intervening with the children.

Dr. Colleen M. Lecher, a licensed mental health professional, testified that she had provided therapy to M.T. and R.T., whom she first met in November 2017 upon Bothern's retirement. Lecher testified that she had never met Jayson and that he was not involved in the children's treatment.

Lecher, who had conducted 20 sessions with M.T., testified that she had diagnosed M.T. with adjustment disorder and depression with symptoms of sadness, confusion, and anxiety. Lecher's treatment goals for M.T. were to increase her ability

to express her emotions and grief over the loss of her mother and to practice relaxation techniques when feeling stressed. Lecher testified that for the numerous adults involved in M.T.'s life, she set a goal of meeting the children's needs of safety and stabilization at home and at school because those issues "looked like a big problem for the group." Lecher described safety and stabilization as making sure transitions are positive and doing everything to be appropriate and consistent, to take care of needs, and to provide structure for adjustment so that the children can "trust their environment."

Lecher observed that M.T. felt compelled to meet the needs of the younger children in Jayson's home as a parenting figure. Lecher opined that the responsibilities M.T. was given for the younger children put their safety at risk because her knowledge of how to care for them was limited and she had no supervision or instruction regarding how to provide care. This, in Lecher's view, also posed a risk to M.T.'s emotional well-being. M.T. told Lecher about an occasion prior to November 2017 when the children were left home alone completely unsupervised and she was scared. Lecher testified this was likely a traumatic memory for M.T. and an "attachment strain" that could cause mistrust of her main caregivers, in addition to the initial risk of having been left home alone.

M.T. reported to Lecher that there were times she wanted to call Kimberly and tell her she was scared or unhappy at Jayson's house, but she thought she would be punished for doing so. M.T. told Lecher that even if she had a cell phone of her own while at Jayson's house, she feared that Jayson would be able to discover that she called Kimberly and she would be grounded or in trouble with Jayson if she did.

M.T. shared with Lecher that she saw Jayson drinking alcohol and getting drunk with his friends. M.T. told Lecher that one time, she crawled underneath a bed at Jayson's residence and found alcohol there. On several occasions, M.T. also brought up the presence in Jayson's living room of what she called marijuana and said she believed there were other illegal drugs in the home as well. M.T.'s mother was incarcerated for

drug offenses, and she was worried that Jayson would go to jail too. Lecher considered accessible alcohol and drugs in the home to be a safety risk for the children.

Within the first 2 months of treatment, M.T. told Lecher that Jayson transported her in a car without a seatbelt. Around the same time, M.T. also said she was scared because Jayson was texting while driving. Lecher testified that on approximately four occasions at the beginning of treatment, M.T. said that the children did not have enough food at Jayson's house and would go home to Kimberly's house hungry. M.T. also expressed concerns to Lecher about three mice in Jayson's house.

Lecher observed that during the first 3 months of therapy, M.T. was secretive about what went on during visitations and struggled with knowing what to say and to whom because she did not want to get in trouble or get anyone else in trouble. She told Lecher that Jayson had told her to keep certain things that go on in his house "secret," but when Lecher tried to follow up, M.T. was very guarded because she was afraid she would get in trouble. In Lecher's opinion, this was a safety risk. M.T. told Lecher that she loved Jayson, but M.T. also had concerns about Jayson's ability to provide safety and to be in a relationship with her, listen to her, communicate with her, and understand her needs. M.T. expressed to Lecher that she believed Jayson could meet these needs, but he would need help to do that before she felt safe with him. Since the decrease in Jayson's parenting time to Wednesday evenings and Saturdays, M.T. had reported feeling less stressed, enjoying planned activities with Jayson, and being happier with their relationship. Lecher observed that since the change, M.T. was able to concentrate and focus more, her mood was more stabilized, and she was more willing to talk about her feelings.

Lecher started seeing R.T. in family sessions shortly after Lecher began treating M.T., and she began treating R.T. on March 1, 2019. Lecher diagnosed R.T. with adjustment disorder with "disturbance of conduct." Lecher explained that this means that R.T. is adjusting to transitions in her living arrangements and separation from her parents and communicating

through negative conduct rather than words. R.T.'s treatment goals were the same as M.T.'s, and she required safety and stabilization in the home, consistency, and plans for de-escalating her "meltdown[s]" and making her feel calm. Like M.T., R.T. had reported that Jayson had instructed her not to disclose to Kimberly everything that went on at his house; R.T. also referred to this information as "secrets" and was very guarded when Lecher asked for more information, fearing she would get into trouble.

Jayson testified that in addition to being the father of M.T., R.T., and T.T., he was the father of a son born in 2006, as well as a son born to Wallen in 2017. Jayson testified that his younger son lived with him and Wallen, along with Wallen's two children, in a three-bedroom, two-bathroom trailer home that belonged to Wallen. Jayson testified that he and Wallen had been in a relationship and lived together for approximately 2 years. Jayson asked the court not to grant access to the children to anyone other than himself. Jayson generally denied or explained the bases for the concerns voiced by other witnesses. Wallen also testified and provided details that generally discounted the concerns brought up by other witnesses.

*District Court Order Disposing of*
*February 24, 2017, "Complaint."*

The district court denied the relief Jayson requested in his February 24, 2017, complaint. It found that Jayson's motion to dismiss the dissolution complaint had not rendered the decree void or unlawful.

Regarding custody, the district court stated that it had "observed the parties, the witnesses and their demeanors, and made determinations as to credibility." It continued, "To the extent the court's recitation of the facts differ from a party's position on those facts, the court's recitation will constitute the court's findings of disputed facts." In particular, the district court noted that Jayson's failure to meet with the guardian ad litem "casts doubt upon his true motivations" and "works against his credibility and position that he is fit, has

satisfactory living arrangements for the children, has the children's best interests in mind, and can care for them appropriately." The district court decided that the parental preference principle had been rebutted by showings of parental forfeiture and unfitness and that the best interests of the children "'lie elsewhere.'" It awarded Kimberly legal and physical custody of the children.

Addressing parenting time, the district court found that Kimberly had proved a material change in circumstances and that the children's best interests required changes to Jayson's parenting time then in effect. Jayson received parenting time every other week from Thursday afternoon through Sunday afternoon and for designated holidays and 4 weeks total during the summer, a change from the initial decree's schedule of Friday evenings through Monday mornings and Wednesday evenings through Thursday mornings.

As to child support, the district court completed child support worksheets based in part on Kimberly's suggested calculations and found a material change in circumstances. For the first time, it ordered Jayson to pay child support on a permanent basis, in the amount of $587 per month.

The district court found that the remainder of the dissolution decree was to stay in effect and that any other relief sought was denied. The parties were ordered to pay their own attorney fees.

*Subsequent Motions and Amended Order.*

Jayson filed a motion for new trial and a motion to vacate, alter, or amend the judgment. The latter motion again asserted, among other things, that the dissolution decree was void. The district court denied the motions, with the exception of the issue of child support.

At a subsequent hearing on the child support issue, Jayson testified regarding his employment history and income. As of February 26, 2019, Jayson was unemployed and looking for employment and also spending time with his young son. Jayson testified that he did not believe he should be ordered to

pay child support because he "takes care of" the children when he has them. Kimberly testified that shortly after December 2015, when Jayson began exercising less parenting time than was awarded him in the original decree, her expenses increased because the children were with her more often.

The district court completed new child support worksheets and entered an order amending the child support aspects of the judgment to require Jayson to pay $236 per month. Jayson was not required to contribute to childcare expenses.

Jayson now appeals.

## ASSIGNMENTS OF ERROR

Jayson assigns that the district court erred in not vacating the decree and declaring it to be void. In the alternative, Jayson assigns that the district court erred in (1) denying Jayson's motion for disqualification for judicial bias, (2) receiving the children's statements to therapists and the therapists' opinions, (3) not modifying the decree to award custody to Jayson, (4) modifying the decree as to parenting time and child support, and (5) not awarding Jayson attorney fees.

## STANDARD OF REVIEW

[1] A jurisdictional question that does not involve a factual dispute is determined by an appellate court as a matter of law, which requires the appellate court to reach a conclusion independent of the lower court's decision. *Simms v. Friel*, 302 Neb. 1, 921 N.W.2d 369 (2019).

[2] A motion requesting a judge to recuse himself or herself on the ground of bias or prejudice is addressed to the discretion of the judge, and an order overruling such a motion will be affirmed on appeal unless the record establishes bias or prejudice as a matter of law. *McCullough v. McCullough*, 299 Neb. 719, 910 N.W.2d 515 (2018).

[3,4] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *Lindsay Internat.*

*Sales & Serv. v. Wegener*, 301 Neb. 1, 917 N.W.2d 133 (2018). A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion. *Id.*

[5] Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination to admit evidence over a hearsay objection or exclude evidence on hearsay grounds. *Pantano v. American Blue Ribbon Holdings*, 303 Neb. 156, 927 N.W.2d 357 (2019).

[6,7] Modification of a dissolution decree is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and will be affirmed absent an abuse of discretion by the trial court. *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020). In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019).

[8] In an action for modification of a marital dissolution decree, the award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014).

## ANALYSIS

*Motion to Vacate Decree as Void.*

We begin with Jayson's contention that the district court erred by not vacating the decree and declaring it void. Jayson takes the position that the motion to dismiss he filed on November 16, 2015, terminated the dissolution action. According to

Jayson, because the district court did not have jurisdiction of the matter after he filed his motion, the entire decree, which includes custody and child support orders, was void and should have been vacated.

Jayson's argument rests on his understanding that he, as the party that filed the dissolution action, had an absolute right to voluntarily dismiss it and that his filing of the motion to dismiss had the effect of immediately terminating the action without need for additional action by the district court. In short, Jayson claims that his November 16, 2015, motion dismissed the action by operation of law the moment it was filed.

Kimberly disagrees, arguing that Jayson did not have the right to unilaterally dismiss the action. Although she concedes that a plaintiff has the right to unilaterally dismiss an action without prejudice under some circumstances, she contends Jayson did not have such a right in this case, because she had filed a third-party complaint seeking temporary custody or visitation, which remained pending at the time of Jayson's motion to dismiss.

It does not appear that when he filed his November 16, 2015, motion, Jayson or his counsel believed that Jayson could unilaterally terminate the dissolution proceedings. Jayson filed a *motion* to dismiss, which would seem to request that the district court take action to effectuate a dismissal rather than notifying it and the other parties of a self-executing dismissal. See Black's Law Dictionary 1168 (10th ed. 2014) (defining "motion" as "written or oral application requesting a court to make a specified ruling or order"). But even if that issue is set to the side and, further, even if we assume that Jayson is correct that he could and did, in fact, dismiss the dissolution proceeding at the moment he filed his motion to dismiss, we still disagree with Jayson that the subsequent decree was void.

If the dissolution action was terminated the moment Jayson filed his motion to dismiss, the action was effectively reinstated. While Jayson is correct that an order of dismissal or dismissal by operation of law generally divests a court of

jurisdiction to take any further action in the matter, we have also held that parties may move to reinstate a dismissed action, that such a motion is treated as a motion to vacate, and that courts generally have jurisdiction to vacate an order of dismissal and reinstate a case. See *Molczyk v. Molczyk*, 285 Neb. 96, 825 N.W.2d 435 (2013). Here, the record indicates that Jayson filed a motion to withdraw his motion to dismiss on November 17, 2015. Although framed as a motion to withdraw his motion to dismiss, our law treats motions according to their substance and not their title. See *Gerber v. P & L Finance Co.*, 301 Neb. 463, 919 N.W.2d 116 (2018). The substance of a motion to withdraw a motion to dismiss asks that the action continue. Accordingly, even if the action was automatically dismissed upon Jayson's motion, Jayson's motion to withdraw the motion to dismiss operated as a motion to vacate the dismissal and reinstate the action, a request that the district court had jurisdiction to entertain. Under this scenario, the district court effectively granted the motion to reinstate by recognizing that Jayson desired that the action continue and proceeding to enter a decree.

For these reasons, we find that the district court did not err in concluding that the decree was not void. We thus proceed to address Jayson's alternative assignments of error.

*Motion for Judicial Disqualification.*
[9,10] Before moving to Jayson's substantive challenges to the modification order, we address his claim that the district court judge erred in not recusing himself. A motion requesting a judge to recuse himself or herself on the ground of bias or prejudice is addressed to the discretion of the judge, and an order overruling such a motion will be affirmed on appeal unless the record establishes bias or prejudice as a matter of law. *McCullough v. McCullough*, 299 Neb. 719, 910 N.W.2d 515 (2018). A judge should recuse himself or herself when a litigant demonstrates that a reasonable person who knew the circumstances of the case would question the judge's impartiality under an objective standard of reasonableness, even

though no actual bias or prejudice was shown. *Thompson v. Millard Pub. Sch. Dist. No. 17*, 302 Neb. 70, 921 N.W.2d 589 (2019). Such instances in which the judge's impartiality might reasonably be questioned specifically include where the judge has a personal bias or prejudice concerning a party or a party's lawyer. See *In re Interest of J.K.*, 300 Neb. 510, 915 N.W.2d 91 (2018). A party alleging that a judge acted with bias or prejudice bears a heavy burden of overcoming the presumption of judicial impartiality. *Thompson v. Millard Pub. Sch. Dist. No. 17, supra*. Jayson has not satisfied this burden.

Jayson's brief contends there were many instances in which the district court demonstrated bias. Because Jayson did not raise some of those allegations before the district court, we will not consider them all. See *Weber v. Gas 'N Shop*, 278 Neb. 49, 54, 767 N.W.2d 746, 750 (2009) ("[a]n appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court"). See, also, *In re Interest of Michael N.*, 302 Neb. 652, 925 N.W.2d 51 (2019). Instead, we confine our review to alleged instances of judicial bias that were raised below and on appeal; and we conclude that the presiding judge did not err in declining to remove himself from the case.

The allegations of bias that Jayson has made below and on appeal arise from hearings in June 2017 and February 2018 relating to temporary alterations of his parenting time. At the hearings, the presiding judge twice allowed Kimberly's counsel additional time to submit exhibits in proper form, over Jayson's objections. On one of those occasions, the judge granted a continuance. The judge also allowed the guardian ad litem to offer opinions despite Jayson's objection. Further, the judge asked Jayson's counsel whether Jayson's affidavit stated that he would not answer any questions posed by any court-appointed guardian ad litem.

[11] Jayson's allegations of bias relate to the presiding judge's courtroom administration and evidentiary and substantive rulings. But "'judicial rulings alone almost never constitute a valid basis for a bias or partiality motion'" directed to a trial judge. *Huber v. Rohrig*, 280 Neb. 868, 875, 791 N.W.2d

590, 598 (2010), quoting *Liteky v. United States*, 510 U.S. 540, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1994). See, also, *Young v. Govier & Milone*, 286 Neb. 224, 835 N.W.2d 684 (2013). Nor can a judge's ordinary efforts at courtroom administration be a basis for bias or partiality. *Id.* Opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. *In re Interest of J.K., supra*.

Our review of the record reveals nothing in the district judge's rulings or other actions that indicates bias or prejudice necessitating recusal. Accordingly, we conclude that the district court did not abuse its discretion when it denied Jayson's motion for recusal.

*Evidentiary Rulings at Modification Hearing.*

Jayson also challenges the district court's modification of the dissolution decree. Relevant to that issue are admissibility rulings at the modification hearing that Jayson also disputes. We address those rulings now.

[12] First, Jayson argues that the district court erred in admitting testimony based on statements that the children and Kimberly made to Bothern and Lecher. He claims those statements were inadmissible hearsay. However, Jayson only assigns that the district court erred in receiving the children's statements, and to be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018). Therefore, we will address only the admissibility of the children's statements to the therapists.

Jayson is correct in identifying the children's statements as hearsay, because it was not the declarants who testified to them and they were received for the truth of the matters asserted. See, Neb. Evid. R. 801(3), Neb. Rev. Stat. § 27-801(3) (Reissue 2016). However, we conclude that they fall under the

medical purpose exception to the hearsay rule and were therefore properly admitted.

[13] Under the medical purpose exception, "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" are not excluded by the hearsay rule. Neb. Evid. R. 803(3), Neb. Rev. Stat. § 27-803(3) (Reissue 2016). Rule 803(3) is based on the notion that a person seeking medical attention will give a truthful account of the history and current status of his or her condition in order to ensure proper treatment. See, *State v. Beeder*, 270 Neb. 799, 707 N.W.2d 790 (2006), *disapproved on other grounds, State v. McCulloch*, 274 Neb. 636, 742 N.W.2d 727 (2007); *State v. Hardin*, 212 Neb. 774, 326 N.W.2d 38 (1982). In order for statements to be admissible under rule 803(3), the party seeking to introduce the evidence must demonstrate (1) that the circumstances under which the statements were made were such that the declarant's purpose in making the statements was to assist in the provision of medical diagnosis or treatment and (2) that the statements were of a nature reasonably pertinent to medical diagnosis or treatment by a medical professional. *State v. Mora*, 298 Neb. 185, 903 N.W.2d 244 (2017).

Jayson asserts, without additional elaboration, that statements made by M.T. and R.T. to Bothern and Lecher were not made for the purposes of or reasonably pertinent to medical diagnosis or treatment. To the extent Jayson implies that the mental health professional services provided by Bothern and Lecher were not medical in nature and that therefore, the medical purpose exception cannot apply, we disagree.

[14] Our prior cases in this area do not support an argument that the medical purpose exception cannot apply to statements made to mental health professionals. First of all, we have stated that "[a]lthough the heart of the rule 803(3) exception lies in statements made by a patient to a treating physician, the exception casts its net wider than the patient-physician

relationship." *State v. Vigil*, 283 Neb. 129, 136, 810 N.W.2d 687, 695 (2012). As a general rule, then, this hearsay exception applies to persons seeking medical assistance from persons who are expected to provide some form of health care. *Vacanti v. Master Electronics Corp.*, 245 Neb. 586, 514 N.W.2d 319 (1994).

More specifically, our cases have applied this hearsay exception to statements made for purposes of obtaining a mental health diagnosis or mental health treatment. In *In re Interest of B.R. et al.*, 270 Neb. 685, 708 N.W.2d 586 (2005), we applied the medical purpose exception to statements a foster mother made to a therapist regarding evidence that the minor patient may have been sexually abused. Although our primary focus in that case was whether statements from someone other than the child herself could be admitted, we concluded that the statements fell within the exception as long as the declarant's purpose in making the statements was to assist in the provision of medical diagnosis or treatment, the declarant's statements were reasonably pertinent to such diagnosis or treatment, and a doctor would reasonably rely on such statements. We determined that statements to the child's therapist setting forth evidence that the child had been sexually abused met these requirements and were thus admissible.

Later, in *State v. Vigil, supra*, we applied the exception to statements made during a child advocacy center forensic interview regarding a sexual assault. There, we considered the dual medical and investigatory purposes of the interview. We held that even when an interview is conducted for both medical and investigatory purposes, the medical purpose exception will apply if the statements were made in legitimate and reasonable contemplation of medical diagnosis or treatment. Relying on our decision in *In re Interest of B.R. et al., supra*, we held that when an individual is alleged to be the victim of sexual assault, "statements reasonably pertinent to medical diagnosis and treatment of both physical and *psychological trauma*" were admissible under rule 803(3). *State v. Vigil*, 283 Neb. at 141, 810 N.W.2d at 698 (emphasis supplied).

Our cases are consistent with those of federal appeals courts. A recent opinion from the Third Circuit Court of Appeals noted that every federal court of appeals that has considered the issue has concluded that statements to mental health professionals for purposes of diagnosis or treatment are admissible under the medical purpose exception to the hearsay rule in the Federal Rules of Evidence. See *U.S. v. Gonzalez*, 905 F.3d 165 (3d Cir. 2018), cert. denied ___ U.S. ___, 139 S. Ct. 2727, 204 L. Ed. 2d 1120 (2019) (collecting cases).

Having determined that statements made to mental health professionals can fall within the medical purpose exception to the hearsay rule, we must consider whether the statements at issue here met the necessary requirements: that the declarant's purpose in making the statements was to assist in the provision of medical diagnosis or treatment, that the declarant's statements were reasonably pertinent to such diagnosis or treatment, and that a medical professional would reasonably rely on such statements. Whether a statement was both taken and given in contemplation of medical diagnosis or treatment is a factual finding made by the trial court in determining the admissibility of the evidence under rule 803(3), and we review that determination for clear error. *State v. Vigil, supra*. Applying that standard here, we find no clear error on the part of the district court.

In the case before us, Kimberly sought assistance for M.T. and R.T. from Bothern and Lecher, health care professionals expected to provide mental or psychological health care. Bothern diagnosed M.T. with adjustment disorder along with depression. In treating M.T., Bothern testified that it was necessary to address her relationship with Jayson and his parenting practices. Lecher made the same diagnosis for M.T., and her treatment goals included helping the adults in M.T.'s life meet M.T.'s needs for safety and stabilization. This entailed providing structure and consistency so that M.T. could trust her environment. Lecher set the same treatment goals for R.T., whom she also diagnosed with adjustment disorder. Statements by M.T. and R.T. relating to their relationship with Jayson

and their time under his care were integral to their diagnosis and treatment, and considering the context in which they were made, the statements could be reasonably relied upon. We find no error in admitting the disputed testimony over Jayson's objections.

Second, Jayson argues that the testimony of Bothern and Lecher lacked foundation and relevance because of what he claims are admissions that they could not offer opinions about Jayson's parental fitness or the best interests of the children. But even if such admissions exist, it does not follow that Bothern and Lecher lacked knowledge relevant to issues that the district court had to resolve in this case. Whether in the form of opinions or personal observations, the testimony of Bothern and Lecher was relevant to custody and parenting time because it painted a picture of the children's time and relationship with Jayson, the children's perception of it, and the effects it was having on them.

As for foundation, the testimony of Bothern and Lecher was based on their personal knowledge. They both spent time with the children in therapy over the course of months or years, with Bothern spending some therapeutic time with Jayson, and as explained above, the therapy itself necessarily focused on Jayson's parenting time and his relationship with the children. Therefore, we are not persuaded that the district court abused its discretion in admitting the therapists' testimony over Jayson's relevance and foundation objections.

We proceed to consider Jayson's remaining claims in light of this admissible evidence.

*Child Custody.*

[15] Jayson challenges the district court's determination that custody of the children should remain with Kimberly. This matter has come to us by way of modification proceedings. Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing either that the custodial parent is unfit or that the best interests of the child require such action. *Jones v. Jones*,

305 Neb. 615, 941 N.W.2d 501 (2020). Jayson does not argue that there has been a material change in circumstances, but argues that modification of the decree to award him custody is required under the parental preference principle.

The parental preference principle establishes a presumption that the best interests of a minor child are served by placing custody with his or her parent. See *In re Guardianship of K.R.*, 304 Neb. 1, 932 N.W.2d 737 (2019). We agree that the parental preference principle governs our analysis. But based on this record and our standard of review, we conclude that the parental preference principle did not require the district court to place the children with Jayson.

The parental preference principle applies to child custody controversies between a biological or adoptive parent on one hand and one who is neither a biological or adoptive parent on the other. See *In re Guardianship of D.J.*, 268 Neb. 239, 682 N.W.2d 238 (2004). In those cases, the parent has a superior right to and is entitled to custody of the child unless the third party negates the parental preference principle. See *id.* On many occasions, we have recognized that the parental preference principle can be overcome by a showing that the parent is unfit or has forfeited the right to custody. See *In re Guardianship of K.R., supra* (collecting cases). In addition, in *Windham v. Griffin*, 295 Neb. 279, 288, 887 N.W.2d 710, 717 (2016), we indicated that the preference could be "negated by a demonstration that the best interests of the child lie elsewhere." We cautioned, however, that we viewed cases in which the best interests of the child defeated the parental preference principle as "exceptional" and further explained that a third party could not overcome the parental preference principle merely by showing that he or she would be able to provide more amenities for the child. *Id.* at 290, 887 N.W.2d at 718.

In this case, the district court concluded that the parental preference principle applied, but found that Kimberly was nonetheless entitled to custody. The district court found the parental preference principle was overcome because Jayson was unfit to have custody of the children, he had forfeited his

right to custody, and it was in the best interests of the children for Kimberly to have custody.

Jayson argues that the district court erred by finding that he was unfit or forfeited his right to custody. As for the district court's conclusion that it was in the children's best interests for Kimberly to have custody, he argues that the parental preference principle cannot be overcome by a showing that it is in the children's best interests for someone other than the parent to have custody and urges us to overrule *Windham v. Griffin, supra*, to the extent it holds otherwise.

We find that it is not necessary for us to consider whether Jayson forfeited his right to custody or whether the parental preference principle was overcome by a showing that it was in the children's best interests for Kimberly to have custody. Even if Jayson's arguments on those points have merit, the parental preference principle would still be negated by a showing that Jayson is unfit. And, as we will explain, viewing the admissible evidence through the lens of the district court's credibility determinations, we cannot say that the district court abused its discretion in finding Jayson was unfit.

[16] Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Guardianship of K.R.*, 304 Neb. 1, 932 N.W.2d 737 (2019). Evidence of unfitness should be focused upon a parent's ability to care for a child, and not any other moral failings a parent may have. *In re Interest of Lakota Z. & Jacob H.*, 282 Neb. 584, 804 N.W.2d 174 (2011). Evidence of a parent's past failings is pertinent only insofar as it suggests present or future faults. *Id.* Parental unfitness must be shown by clear and convincing evidence. See *In re Guardianship of D.J., supra*.

The district court heard evidence that under Jayson's care, the children's physical well-being was at risk. This included evidence of poor living conditions. Jayson had acknowledged that his earlier residence was in disrepair and had issues

with mice and insect infestations. Kimberly testified that at the time Jayson lived there, she found cockroaches in M.T.'s school backpack. There was evidence that at Jayson's next residence with Wallen, similar problems persisted, including mice and a months-long lice issue. In September 2017, the children left Jayson's residence in the middle of the night due to an odor of urine, a moldy hole in the wall, and the presence of ants in their bedroom. While Jayson insists his home was in a much better condition than portrayed by Kimberly's witnesses, he passed up the opportunity to have a third party, the guardian ad litem, visit it.

Other evidence showed a risk to the children's safety. Kimberly testified that the children often returned from Jayson's home with animal bites or scratches. During the year before trial, the children routinely returned from Jayson's house hungry, dirty, and dressed in clothing that was either the wrong size or inappropriate for the weather. At that time, M.T. reported that she had been punished by losing a meal and told Lecher that she did not have enough food to eat when she was at Jayson's house. During the year preceding trial, M.T. also reported that for "'fun,'" Jayson had shot the children with a pellet gun. Also during the year before trial, M.T. reported the presence of drugs and alcohol in Jayson's home, which she was able to access, and said she had observed Jayson intoxicated, when the decree prohibited Jayson from consuming alcohol within 24 hours prior to or during his parenting time. Kimberly testified that Jayson often transported the children without proper car restraints, and during the year before trial, M.T. also reported that Jayson had transported her without a seatbelt and had texted while driving. Evidence was also introduced that Jayson did not supervise the children properly, including during swimming outings. When the children were returned from swimming outings with Jayson, Kimberly testified that they were nearly always sunburned. Sometimes Jayson entrusted M.T. with supervising the younger children, leaving them home alone, when, according to Bothern and Lecher, M.T. was not developmentally ready to supervise

others. According to Lecher, this posed an initial safety risk to the children and also could diminish M.T.'s ability to trust her caregivers, posing a future safety risk.

In addition to issues of physical health and safety, there was evidence that Jayson had not routinely contributed financially to the children's care. Until these proceedings, Jayson was not obligated to pay child support, but there was no evidence that he had otherwise contributed to their maintenance aside from childcare expenses he paid after contempt proceedings and what was incidental to his limited and inconsistent parenting time.

The record in this case also contains evidence that Jayson's parental shortcomings have been or probably will be detrimental to his children's mental and emotional well-being. At the time of trial, both M.T. and R.T. were undergoing treatment for adjustment disorders. An atmosphere of safety and stabilization was part of their treatment, but their experience under Jayson's care, described above, was inconsistent with these mental health needs. And in assessing parental fitness, we have considered a parent's ability to meet the particular needs of a child. See *In re Guardianship of K.R.*, 304 Neb. 1, 932 N.W.2d 737 (2019).

Other evidence also showed that Jayson posed a detriment to the children's mental and emotional well-being. Contrary to the initial decree, in 2015 and 2016, Jayson was inconsistent about giving M.T. antidepressant medication she needed regularly to modulate her moods, emotions, and behavior, despite reminders from M.T. herself. Jayson's "boys will be boys" response to M.T.'s concerns about older boys at his previous residence exposing themselves to her and touching the genitals of a young girl in the home could be understood as dismissive. And Jayson consistently put the children, especially M.T., in a position that required them to choose whether they were loyal to him or to Kimberly. He asked them to keep the goings-on at his home "secret," and if the children did disclose such information, they would be in trouble with Jayson. This caused internal struggles for M.T. Fearing

discovery and punishment, M.T. reported that she did not feel free to call Kimberly if she was scared or unhappy at Jayson's house. In June 2017, CPS and the police came to the home after Jayson left the children home alone, and due to Jayson's anger with M.T. over the situation, M.T. lied about the matter. Lecher observed that M.T. had an "attachment strain" as a result of being left home alone. Jayson caused further emotional turmoil for M.T. by telling the children to misbehave for Kimberly.

Jayson's detrimental effect on the children's mental and emotional health was evident when his visitation was temporarily reduced. Kimberly testified that when visits with Jayson were scaled back, the children's behavior and school performance improved, and Lecher testified that upon Jayson's reduced visitation, M.T. became less stressed, more stable in her mood, able to focus more, and more open about her feelings. M.T. was also happier with her relationship with Jayson, whom she loved, but she questioned his ability to provide for her safety and understand her needs.

Despite Jayson's expressing intentions to improve as a parent, this history, along with other testimony, is evidence that at the time of trial, he did not have either the will or the capacity to do so. According to Bothern, she observed that Jayson frequently did not follow through with her recommendations, even though he was easy to work with in the clinic. This may not, on its own, demonstrate unfitness, but it could reasonably be understood as demonstrating a reluctance or inability to change his parenting practices.

We have reviewed the testimony of Jayson and Wallen, in which they either denied or explained the circumstances above and generally cast a positive light on Jayson as a parent. But the district court's order demonstrates that it did not find this testimony to be credible. In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

*Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019). Because this court is not positioned to pass on the credibility of the witnesses like the district court was, we defer to the district court's credibility determinations in our assessment of the facts.

Jayson argues that this case is "*nothing* like notable parental preference cases in which the appellate court affirmed the lower court's decision to award custody . . . of a child to a nonparent." Brief for appellant at 24 (emphasis in original), citing *In re Guardianship of K.R.*, 304 Neb. 1, 932 N.W.2d 737 (2019); *State on behalf of Lilliana L. v. Hugo C.*, 26 Neb. App. 923, 924 N.W.2d 743 (2019); and *State on behalf of Combs v. O'Neal*, 11 Neb. App. 890, 662 N.W.2d 231 (2003). But the cases Jayson cites are as different from one another as they are from this one. And, even if the cases presented by Jayson shared some factual similarities with this case, our analysis would not depend on a fact-for-fact comparison.

Taken alone, many of Jayson's individual parental shortcomings might not amount to unfitness. However, the parental fitness analysis is a fact-intensive inquiry. See *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). Accordingly, we must review the record in this case in totality, rather than focusing on whether any one piece of evidence, viewed in isolation, demonstrates unfitness. Having done so in this case, and given the deference we owe to the trial court's credibility determinations, we cannot say that the district court abused its discretion in finding Jayson unfit by clear and convincing evidence and ordering that custody remain with Kimberly.

*Parenting Time.*

Jayson asserts that even if the district court did not err in its custody determination, it erred in modifying his parenting time. The district court modified Jayson's unsupervised parenting time to every other week from Thursday afternoon through Sunday afternoon and designated holidays, plus summer visitation. Under the initial decree, Jayson's unsupervised parenting time had been previously scheduled for Friday evenings

through Monday mornings and Wednesday evenings through Thursday mornings.

[17-20] Visitation rights established by a marital dissolution decree may be modified upon a showing of a material change of circumstances affecting the best interests of the children. *VanSkiver v. VanSkiver*, 303 Neb. 664, 930 N.W.2d 569 (2019). A material change in circumstances means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. *Id.* The party seeking to modify visitation has the burden to show a material change in circumstances affecting the best interests of the child. *Id.* The best interests of the children are primary and paramount considerations in determining and modifying visitation rights. *Id.*

Jayson argues the district court could only modify his parenting time if Kimberly proved that between the December 2015 decree and the modification proceedings, a material change of circumstances had taken place and Kimberly failed to prove such a change. We disagree. Evidence during this time period showed that Jayson was inconsistent in exercising his parenting time, and when he did, it negatively affected the children's mental and physical well-being. There was also testimony that the children had a therapeutic need for stability and consistency, which Jayson was not able to provide. Thus, it was not an abuse of discretion for the district court to find there had been a material change of circumstances regarding parenting time that affected the best interests of the children.

Jayson also argues the district court abused its discretion in modifying Jayson's parenting time, because the district court modified it to a "level below" the parenting time Kimberly requested in her answer and cross-complaint. Brief for appellant at 32. The parenting time ordered by the district court did differ from that requested by Kimberly, but it is not so clear to us that it was a "level below," as Jayson contends. The district court's parenting time order granted Jayson less time with the children than Kimberly requested, but it also granted

Jayson unsupervised time when Kimberly requested that it be "fully supervised." In any event, we are not convinced by Jayson's position.

Jayson argues that *Eric H. v. Ashley H.*, 302 Neb. 786, 925 N.W.2d 81 (2019), precluded the district court from reducing Jayson's parenting time below that requested by Kimberly. In that case, we held that a district court did not abuse its discretion by concluding that sexual abuse by the child's stepfather was the only material change of circumstances alleged in a complaint to modify and therefore within the scope of the modification proceeding. Jayson makes no argument here that Kimberly relied on evidence outside the scope of her pleadings to demonstrate a material change of circumstances.

Kimberly's answer and cross-complaint alleged several material changes in circumstances affecting the children's best interests and requested a change to the parenting time schedule. Jayson was on notice that parenting time was at issue, and he had the opportunity to put on any and all evidence pertinent to the parenting time schedule. See *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018) (due process requires reasonable notice and opportunity to be heard appropriate to nature of proceeding and character of rights to be affected). We conclude that the district court did not exceed the scope of the pleadings or rule without notice to Jayson in modifying his parenting time.

*Child Support.*

Jayson argues that the district court erred in modifying the decree to impose a child support obligation on him, when none existed before. Jayson does not dispute the district court's calculation of the amount of child support or that Kimberly, as a third party, could be entitled to child support. See Neb. Ct. R. § 4-222 (rev. 2011) (if child resides with third party, court shall order each parent to pay to third party his or her respective amount of child support). Instead, Jayson contends that there was no material change in circumstances to justify any modification to his child support obligation.

[21] A party seeking to modify a child support order must show a material change in circumstances that (1) occurred subsequent to the entry of the original decree or previous modification and (2) was not contemplated when the decree was entered. *Hotz v. Hotz*, 301 Neb. 102, 917 N.W.2d 467 (2018). According to Jayson, there was no material change in circumstances as to child support because there was no evidence that his income or the children's expenses had increased since the original decree and because custody remained with Kimberly. We find no merit to this argument.

Although Jayson asserts that there was no change in custody between the original decree and the order modifying it, a closer analysis reveals a more complicated picture. The initial decree provided that Kimberly had physical and legal custody of the children. The decree scheduled Jayson's parenting time for Friday evenings through Monday mornings and Wednesday evenings through Thursday mornings. Supervised parenting time with Erica was by arrangement. Under this schedule, the amount of time the children were to spend with Jayson was nearly equal to the amount of time the children were to spend with Kimberly. In fact, this schedule provided for the children to spend more nights with Jayson than with Kimberly. And we have previously explained that a trial court can effectively establish a joint physical custody arrangement by awarding nearly equal parenting time even if it uses a different label to describe the arrangement. See *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). See, also, Neb. Rev. Stat. § 43-2922(20) (Reissue 2016) (defining physical custody as authority and responsibility regarding child's place of residence and exertion of continuous parenting time for significant periods of time). In the order modifying the decree, however, the district court reduced Jayson's parenting time to every other week from Thursday afternoon through Sunday afternoon and designated holidays, with 4 weeks total during the summer. After the modification order, Jayson clearly did not have physical custody of the children.

Regardless of whether there was a change in custody, Kimberly's regular time with the children increased significantly between the original and modified decrees. And even when Jayson's blocks of summer parenting time are considered, her overall time with the children was no longer roughly equivalent to Jayson's. Under the modified decree, the children would spend more than twice as many nights with Kimberly than they would with Jayson. Further, Kimberly testified that the more time she had the children, the more expenses she incurred. This permanent change to Jayson's parenting time and the corresponding increase in expenses for Kimberly were not contemplated at the time of the original decree, and we conclude that they amounted to a material change in circumstances, which permitted modification of Jayson's child support obligation. But see *Brodrick v. Baumgarten*, 19 Neb. App. 228, 809 N.W.2d 799 (2011) (finding *temporary* change to amount of parenting time did not amount to material change in circumstances).

*Attorney Fees.*

Jayson contends that the district court erred in declining to award him attorney fees. This argument is based on his position that he should have prevailed in this matter. Because we have found no merit to Jayson's other claims, we conclude that the district court did not abuse its discretion in rejecting this one. See *Noonan v. Noonan*, 261 Neb. 552, 624 N.W.2d 314 (2001).

## CONCLUSION

For the reasons set forth above, we find no error on the part of the district court and affirm.

Affirmed.