IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

MILBOURN V. MILBOURN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

MICHAEL J. MILBOURN, APPELLANT AND CROSS-APPELLEE,

V.

JESSICA L. MILBOURN, APPELLEE AND CROSS-APPELLANT.

Filed January 12, 2021.   No. A-20-331.

Appeal from the District Court for Hall County: ANDREW C. BUTLER, Judge. Affirmed.

Charles R. Maser for appellant.

Terrance A. Poppe and McKynze P. Works, of Morrow, Poppe, Watermeier & Lonowski, P.C., for appellee.

PIRTLE, Chief Judge, and MOORE and ARTERBURN, Judges.

PIRTLE, Chief Judge.

INTRODUCTION

Michael J. Milbourn appeals, and Jessica L. Milbourn cross-appeals, from the decree entered by the district court for Hall County dissolving their marriage. The single issue presented in this appeal is whether the district court abused its discretion in awarding the parties joint physical custody of their minor child. For the reasons that follow, we affirm.

BACKGROUND

Michael and Jessica married in September 2008. They have one minor child, Ostynn, who was 10 years old at the time of trial. On December 22, 2016, Michael filed a complaint for dissolution of marriage in the district court. In February 2017, the district court entered an order for temporary custody, granting the parties joint legal and physical custody of Ostynn, with each party having 1 week of alternating parenting time.

- 1 -

At trial in November 2019, Michael requested "full custody" of Ostynn, subject to Jessica's reasonable rights of visitation. He did not submit a proposed parenting plan. Michael testified that during the marriage and since the separation, he generally worked 7 days a week between his two businesses, a car dealership and an auto mechanic shop, while Jessica stayed home with Ostynn. He testified that his normal workday began at 8 a.m. and ended between 8 and 11 p.m. Michael testified that since the separation, Ostynn was cared for by his mother or by his live-in girlfriend while he was at work. During his week of parenting time, Michael would spend 15 to 20 hours of quality time with Ostynn. Michael testified that Ostynn would visit him at his auto shop after school and that they would play outside and ride bicycles when the weather was warm. He testified that at his residence, Ostynn had her own bedroom and bathroom, as well as a playroom. Michael described his relationship with Ostynn as "very loving." Michael further testified that Ostynn loved his girlfriend "like another mother" and that he had no concerns about his girlfriend and Ostynn spending time together. Michael testified that there had been a time when Jessica wished to take Ostynn out of state during his parenting time in order to attend the wedding of Ostynn's older half-sister, but that he had objected due to the number of days Ostynn would have missed from school.

On cross-examination, Michael admitted that in a prior court hearing, he had testified that Jessica should be awarded sole legal and physical custody of Ostynn. He also admitted that he did not believe Jessica treated Ostynn badly. He agreed that prior to the parties' separation, Jessica was primarily responsible for Ostynn's care, which included preparing meals, taking Ostynn to and from school, scheduling and attending Ostynn's medical appointments, and attending parent-teacher conferences. Michael also admitted that since the parties' separation, he rarely took Ostynn to school, and that instead, either his mother or girlfriend would transport Ostynn to and from school. He admitted that his girlfriend had a prior felony conviction and had served time in prison. Michael denied that he had ever refused to allow Ostynn to call Jessica during his parenting time or tried to deny Jessica her time with Ostynn.

At trial, Jessica submitted a proposed parenting plan requesting that the parties share joint legal custody of Ostynn and that sole physical custody be awarded to Jessica, subject to Michael's reasonable parenting time. Jessica testified that during the marriage, she had primarily stayed at home with Ostynn. She testified that she had taken Ostynn to all of her medical appointments and social activities without Michael. Jessica further testified that due to Michael's work schedule during the marriage, he was rarely home when Ostynn woke up in the morning and usually came home after Ostynn was already asleep.

At the time of trial, Jessica was employed full time as an office assistant and had nights and weekends off. Jessica testified that during her parenting time, she would help Ostynn with her homework, watch movies with her, and take her to play laser tag. She testified that since the separation, she had been living with her father, and that she and Ostynn shared a bedroom. Jessica further testified that the reason she was seeking full custody of Ostynn was because she was concerned about the amount of time Michael was able to personally take care of Ostynn during his parenting time. Jessica also expressed concerns about Ostynn's relationship with Michael's girlfriend.

On cross-examination, Jessica admitted that Michael was a good financial provider during the marriage, and that there had been an arrangement between them that Michael would work

while Jessica stayed in the home to care for Ostynn. She agreed that Michael had never denied her parenting time during the 2½ years the temporary parenting order had been in effect.

John Flaherty, Ostynn's mental health counselor, testified at trial. Flaherty testified that he had seen Ostynn 13 times between April 2017 and July 2019. He testified that when he first met her, Ostynn was struggling with the parties' separation and the temporary parenting plan. He observed Ostynn to be "somewhat guarded" and that she "felt in between her parents, because both had competing interests for her." Flaherty testified that at Ostynn's most recent appointment, she reported feeling stressed "because she had come to the conclusion that she wanted to spend more time with her father than with her mother, and that she did not know how to tell her mother that." Flaherty testified that it was apparent that Ostynn cared for both of her parents. He testified that over time, Ostynn had "acclimated" to the parenting plan and that her symptoms of anxiety and distress over the divorce proceedings had "mostly subsided."

On cross-examination, Flaherty admitted that in his experience, "it's always better if children are able to be cared for by their primary nurturers or their primary caretakers." He testified that if third persons are substituted for parents in the role of primary caretaker, "[c]hildren tend to feel less secure and less safe." Flaherty also expressed concerns about the "hostile, uncooperative" parenting dynamic between Michael and Jessica. However, Flaherty agreed that his assessment was based solely on conversations with Ostynn and with Jessica, and that he had never met Michael or his girlfriend.

Michael's girlfriend, Stacia Lund, testified at trial. She testified that she had lived with Michael since August 2017 and that they planned to be married. She testified that she considered Ostynn to be her daughter. Lund testified that she helps Ostynn with schoolwork, that they make crafts together, and that she takes Ostynn to activities such as bowling and to church. She further testified that during his parenting time, Michael shows Ostynn around at work, helps her with crafts and other projects, watches television with her, and takes her out to eat. She testified that there was nothing in Michael's behavior toward Ostynn that she found concerning. On cross-examination, Lund admitted that she had prior felony convictions for forgery and possession of controlled substances, but stated that she had been sober for 8 years.

Jessica's older daughter and three family friends testified generally that the relationship between Ostynn and Jessica was positive and that they had no concerns with Jessica's abilities as a parent.

Michael's mother testified that Michael and Ostynn had a close relationship and that she frequently brought Ostynn to Michael's work so that the two could spend time together.

The district court interviewed Ostynn in camera with attorneys present. During the interview, Ostynn expressed that she enjoyed spending time with both her parents. She also testified that Michael's girlfriend was "like a sister or a friend" to her.

Following trial, the district court entered an order dissolving the marriage. In its decree of dissolution, the court found that both Michael and Jessica were fit and suitable parents and that awarding joint legal and physical custody was in Ostynn's best interests. Parenting time was split into an alternating "week on/week off" schedule.

Michael appealed from the district court's decree, and Jessica cross-appealed. However, Michael failed to file an appellant's brief, and only Jessica's cross-appeal remains before this court.

ASSIGNMENTS OF ERROR

On cross-appeal, Jessica assigns that the district court abused its discretion in awarding the parties joint physical custody of Ostynn.

STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id.* In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. *Id.* However, when the evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id.* A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

ANALYSIS

Jessica assigns that the district court abused its discretion in awarding joint physical custody of Ostynn to the parties, subject to a "week on/week off" parenting schedule. She argues that the district court abused its discretion both in finding that Michael was a fit parent and in finding that joint physical custody was in Ostynn's best interests.

Joint physical custody is neither favored nor disfavored under Nebraska law, and, in fact, no custody or parenting time arrangement is either favored or disfavored as a matter of law. *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). When custody of a minor child is an issue in a proceeding to dissolve the marriage of the child's parents, child custody is determined by parental fitness and the child's best interest. *Maska v. Maska*, 274 Neb. 629, 742 N.W.2d 492 (2007).

Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Tilson v. Tilson*, 307 Neb. 275, 948 N.W.2d 768 (2020). Evidence of unfitness should be focused upon a parent's ability to care for a child, and not any other moral failings a parent may have. *Id.* Evidence of a parent's past failings is pertinent insofar as it suggests present or future faults. *Id.* And in assessing parental fitness, an appellate court may consider a parent's ability to meet the particular needs of a child. *Id.*

Jessica argues that the evidence at trial "established that [Michael] was an unfit parent as his care of Ostynn is so limited by his job situation he is incapable of providing for Ostynn's needs himself, thus preventing him from taking on the parental obligation of child rearing and causing detriment to Ostynn's wellbeing." Brief for cross-appellant at 11.

Evidence at trial established that Michael was a self-employed business owner and that he worked long hours, often 7 days a week. However, long workdays do not, in and of themselves, indicate that a parent is unfit. Multiple witnesses testified that Michael is a loving parent and that he has a good relationship with Ostynn. When asked if she had concerns about Michael's parenting abilities, Jessica did not express concerns beyond his work schedule. Michael testified without contradiction that he would spend 15 to 20 hours one-on-one with Ostynn on a weekly basis. There was no evidence presented that Michael had ever physically harmed Ostynn, neglected her material needs, or otherwise demonstrated a deficiency or incapacity that would affect his ability to perform his parental obligations. Based upon our de novo review of the record, we determine that the district court did not abuse its discretion in finding that Michael is a fit parent.

When both parents are found to be fit, the inquiry for the court is the best interests of the children. *Maska v. Maska, supra.* When determining the best interests of the child in deciding custody, a court must consider, at a minimum, (1) the relationship of the minor child to each parent prior to the commencement of the action; (2) the desires and wishes of a sufficiently mature child, if based on sound reasoning; (3) the general health, welfare, and social behavior of the child; (4) the credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse. Neb. Rev. Stat. § 43-2923(6) (Reissue 2016).

In addition to these statutory "best interests" factors, a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational need of the child. *Schrag v. Spear, supra.*

Nebraska's Parenting Act also provides that the best interests of a child require a parenting plan that provides for a child's safety, emotional growth, health, stability, physical care, and regular school attendance, and which promotes a child's continued contact with his or her families and parents who have shown the ability to act in the child's best interests. § 43-2923(1) and (5).

In support of her position that joint physical custody was not in Ostynn's best interests, Jessica points again to Michael's long work hours. She argues that the evidence at trial showed that Michael's "employment situation is such that he has historically spent very little time with the minor child and there was no evidence produced at the time of trial that this situation was going to change in the foreseeable future." Brief for cross-appellant at 13. Jessica also claims that joint physical custody disrupts Ostynn's relationship with her older children, who are Ostynn's half siblings.

While both the amount of time that a parent is able to devote to a child and the preservation of family relationships are considerations in resolving a child custody dispute, they are not the only factors a trial court must consider. Here, the evidence showed that Ostynn had strong, loving relationships with both Michael and Jessica. Testimony showed that both parties spent quality time with Ostynn and took care for her health and education. Ostynn expressed to her counselor, Flaherty, that she preferred living with Michael. During the in camera interview, Ostynn indicated that she enjoyed staying at Michael's house and spending time with both Michael and his

girlfriend. Although Michael's girlfriend has a prior conviction, there was no evidence that her relationship with Ostynn was ever inappropriate or harmful. Further, the parties were able to abide by the joint custody provision in the temporary order for nearly 2 years and the parenting schedule had worked well for their daughter.

Upon our de novo review, we cannot say that the district court abused its discretion in finding that joint physical custody was in Ostynn's best interests. Jessica's argument on cross-appeal fails.

## CONCLUSION

We conclude that the district court did not abuse its discretion in awarding the parties joint physical custody of their minor child, Ostynn. The order of the district court is affirmed.

AFFIRMED.