IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

RAMIREZ V. MAGANA

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JOSE A. RAMIREZ, APPELLEE,

V.

KARINA MAGANA, APPELLANT.

Filed March 18, 2025.    No. A-24-203.

Appeal from the District Court for Hall County: PATRICK M. LEE, Judge. Affirmed.

Dana DeSimone, of Kearney & DeSimone Law Offices, for appellant.

Jose A. Ramirez, pro se.

MOORE, PIRTLE, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Karina Magana appeals from the district court of Hall County's order establishing the paternity of Jose Ramirez and awarding the parties joint legal and physical custody of their minor daughter Aria Ramirez. Magana assigns that the court erred in failing to award her sole physical custody. For the reasons set forth herein, we affirm.

## II. STATEMENT OF FACTS

### 1. BACKGROUND

During their 14-year relationship, Magana and Ramirez never married but lived together and had one daughter, Aria, who was born in June 2018. The parties separated in August 2022. In early October, Ramirez moved out of their shared home. During the short period of time that Ramirez vacated the parties' home, he did not inform Magana of his address. In December 2022, Ramirez began living in the parties' home full-time after Magana vacated the home.

- 1 -

## 2. COMPLAINT AND OCTOBER 2022 EX PARTE TEMPORARY ORDER

In October 2022, Ramirez filed a complaint for a determination of paternity, custody, visitation, and support. Ramirez sought temporary and permanent sole legal and physical custody of Aria.

On October 21, 2022, Magana filed a "Motion for Temporary and Ex Parte Order" in which she requested the temporary, care, custody and control of Aria and a temporary order restraining Ramirez from "threatening, assaulting molesting or otherwise disturbing the peace of [Magana] or [Aria]." Magana's affidavit, which was filed the same day, set forth allegations including that she was concerned about Ramirez' mental health and that he might take Aria out of the state without her knowledge and permission; that on October 21, 2022, Ramirez picked up Aria early from school without her permission and would not return her; and that Ramirez had an alcohol problem and had recently been charged with driving under the influence (DUI).

On October 24, 2022, the district court entered an ex parte order awarding Magana temporary custody of Aria and ordered that Ramirez was "restrained from threatening, assaulting, molesting, attacking or otherwise disturbing the peace of [Magana] and [Aria]."

## 3. NOVEMBER 2022 TEMPORARY ORDER

In November 2022, the court entered a temporary order awarding Magana sole legal and physical custody of Aria subject to Ramirez' supervised parenting time. The order also provided that neither Ramirez nor Magana were allowed to remove Aria from the State without prior written approval of the court. The court noted its concern related to

> the apparent state of flux that [Ramirez] appears to currently be attempting to manage. The evidence presented shows an unclear picture of his current work or living arrangement. In reviewing the evidence presented, the Court cannot determine where [Ramirez] is currently residing. Additionally, [Ramirez'] affidavit discuss[ed] awaiting FMLA status . . . [and] a text message purportedly from [Ramirez] to [Magana] seems to tie his FMLA status to issues of lack of sleep and mental health issues. While this Court will never hold an individual's decision to seek counseling against them in a custody determination (quite the opposite), the partial information received in this case causes concern for the Court that [Ramirez] has not found the necessary stability in his residency or course of treatment to be able to effectively execute joint legal and physical custody. However, this order is a temporary order for a reason as [Ramirez] has the ability to remedy these areas in the coming months with additional evidence to provide to the Court.

## 4. JULY 2023 MODIFICATION OF TEMPORARY ORDER

In July 2023, the court modified the temporary order to allow Ramirez unsupervised visitation on the schedule previously ordered. The court noted that, since the entry of the November 2022 order,

> the evidence indicates that [Ramirez] has obtained, and maintained, a residence that is appropriate for Aria. In addition, [Ramirez] has used the intervening months to obtain a mental health evaluation which does not indicate the need for any additional services. However, the Court is concerned with the allegations contained in [Magana's] affidavit

where [Ramirez] is alleged to continue to speak in derogatory terms, within earshot of Aria, of members of [Magana's] family.

Accordingly, the court order restrained both parties "from discussing the pendency of this matter, or their opinion about the other parent or any family member or friend, to Aria or within any area Aria may be able to hear."

## 5. TRIAL

The trial was held in January 2024. Witnesses included Ramirez; Magana; Magana's mother and father; Ramirez' brother, Edgar Ramirez; Ramirez' sister, Marayah Ramirez Pantoja; Ramirez' mother, Maria Pantoja; and Ramirez' friends, Marcus Shupe, Manuella Palomares, and Cynthia Mendez. The testimony presented at trial can be broken down into the following categories: (a) evidence regarding Ramirez' mental health; (b) testimony regarding Ramirez being violent; (c) evidence regarding parenting time; (d) communication between the parties; (e) evidence regarding best interests; and (f) testimony from individuals other than Ramirez and Magana.

### (a) Testimony Regarding Ramirez' Mental Health

Ramirez testified that he has been continuously employed as a finance analyst with his current employer since January 2018 or 2019, and that he also has a real estate license. Magana agreed that Ramirez had been employed but testified that after she and Ramirez separated in August 2022, Ramirez "kind of went crazy" by not sleeping and keeping her up all night and texting her "paragraphs and paragraphs of how he was not okay" and, in one message, stating "that his head was not okay." At that time, she believed that Ramirez stopped going to work after he informed her that he had a mental illness and was going to try to get time off under the Family and Medical Leave Act (FMLA). Ramirez admitted that he texted Magana in September 2022 stating that "I am thinking with sickness I have had in my head and unstable health that I can go see a therapist . . . and get FMLA from work," but explained that, at that time, Magana had been alienating him from Aria and he had not been able to sleep for about a month. Ramirez denied quitting his job but admitted that during this time, he saw a doctor for insomnia due to a diagnosis of acute depression related to visitation issues regarding Aria. Ramirez testified that the doctor said the issue was temporary and that the issue would resolve once the visitation issue was settled. A letter from that doctor dated October 28, 2022, stated in pertinent part:

> I am writing this letter to confirm that . . . Ramirez is a current patient of mine. I have been providing care since September 30, 2022. [Ramirez'] current medical condition in no way poses any threat, danger or harm to his daughter. Current FMLA status does not interfere with his ability of being a father. It is expected he will make a full recovery from his current medical condition.

Ramirez reported that he progressed beyond the acute depression stage and was feeling "extremely better."

Ramirez admitted that he previously attended therapy but stopped attending because he had been "cleared." Ramirez testified that currently he is in a stable relationship, is in a good head

space, and that his current financial situation prevents him from attending therapy. He further denied that he has a mental health disability. And although he admitted to being charged with a DUI in March 2022, he stated that he completed his sentence satisfactorily and denied having an alcohol problem.

A letter sent from Ramirez' counselor to Ramirez' attorney was received as exhibit 22. The undated and unsigned letter stated:

> This letter is in regard to my client, . . . Ramirez. [Ramirez] has been involved in counseling since September 29, 2022.
>
> [Ramirez] has never reported any suicidal or homicidal ideation during his counseling sessions. When assessed, he denies ever having suicidal or homicidal thoughts. [Ramirez] denies any psychotic symptoms and no psychosis has been noted. He is of sound mind and memory. He is willingly involved and engages in therapy.
>
> [Ramirez] has a history of being highly functioning and successful. I commend him on choosing to seek counseling as he is learning how to resume a fulfilling life during and after the breakup of a 14-year, long-term relationship. [Ramirez] demonstrates progress, as seen by improved mental health status and personal reports. He utilizes coping skills. He has shown he is of a sound mind and able to parent his daughter.

In addition to counseling, Ramirez underwent a mental health evaluation in July 2023 at the encouragement of his attorney. A copy of that evaluation was received into evidence as exhibit 20. The evaluator noted that Ramirez was cooperative and did not appear to misrepresent himself. Ramirez did not report any current mental health concerns, reported controlled drinking, and denied using any drugs. Collateral information was obtained from Ramirez' girlfriend who denied any concerns with Ramirez' mental health or use of substances.

Magana testified that after Ramirez' mental health evaluation, she had hoped that he would respect her and that he would not use occasions when she communicated with him to coordinate Aria's care to verbally attack her. However, in March 2023, she petitioned for a harassment protection order against Ramirez which, following a hearing, was granted for the period of 1 year. The incidents of harassment included when Ramirez showed up at Aria's dentist appointment yelling that Magana had cheated on him; when Ramirez became angry that Magana was not answering his call because she was driving with Aria in the car and Ramirez pulled up in his vehicle, started honking, and nearly ran her off the road; when he followed her while she was driving; when he showed up at Magana's mother's home recording her on video; and when he made false accusations about Magana having been raped, which he repeated in front of others including Aria.

(b) Testimony Regarding Ramirez Being Violent

Although Ramirez denied being violent, Magana testified that during Thanksgiving 2021, at Magana's sister's home, Ramirez accused Magana's brother-in-law of inappropriately touching Magana and demanded that they leave immediately. As they were leaving the home, Ramirez attacked Magana's brother-in-law in front of Magana's nieces. Magana's brother-in-law was treated at the hospital for injuries sustained.

Magana called her mother and father to testify regarding another incident of concerning behavior exhibited by Ramirez. Both Magana's mother and father testified that on Thanksgiving 2022, when Ramirez arrived at their home to pick up Aria, Ramirez was "knocking really hard at the door yelling," which scared Aria, who ran to her room and hid behind her bed.

Ramirez denied ever physically hurting Magana, denied threatening Magana or her family, and denied threatening to leave Nebraska with Aria without Magana's permission. Ramirez admitted calling Magana a "bitch" and a "slut" in a text message but denied saying "unkind" things about Magana in front of Aria.

(c) Parenting Time

Following the entry of the November 2022 temporary order that required Ramirez' parenting time to be supervised by individuals agreeable to the parties, numerous people supervised his visits at various times including his brother Edgar; his sister Marayah; his mother Maria; and his friends Marcus, Manuella, and Cynthia. According to Ramirez, he and Magana had "extreme difficulties" agreeing on people to supervise his visits and that Magana would decide someone was not an appropriate person to supervise visits even after that person had previously supervised visits. And if Ramirez could not locate a person approved by Magana to supervise his visit, she would not allow the visit to occur.

Magana disputed Ramirez' claim that she prevented him from having parenting time with Aria but admitted that there were "a couple of times" when she did not allow Ramirez to take Aria for his supervised parenting time such as when Ramirez arrived at Magana's mother's home without notice demanding to see Aria, when Ramirez listed several people who were going to supervise his visit in shifts but Magana could not reach any of those individuals, and when they could not mutually agree on a supervisor for the visit.

Ramirez also testified that Magana rejected his requests for additional visitation except for "less than a handful of times in the last year and a half." In response, Magana testified she had given Ramirez additional parenting time on over 60 occasions including a 2-day trip to Colorado in October 2022; on Aria's birthday in June 2023; and on an overnight visit on Thanksgiving 2023. Magana also testified that she offered to let Ramirez have overnight weekend visits with Aria at his request because Aria kept mentioning that "dad wants overnights." She also agreed to Ramirez' request for two Wednesday overnight visits with Aria.

Ramirez testified that he "took every opportunity [Magana] gave me [to have] extra [visitation.]" However, Magana offered into evidence text messages from December 2022 in which she told Ramirez that if he moved back into the home that they had previously shared, she would agree to extend his court-ordered parenting time to allow an overnight visit during his parenting time the following weekend. He responded that he was not "a part time dad or a weekend dad." Ramirez admitted that in January 2023, Magana offered Ramirez extra time because Aria wanted to spend time with him, but he responded that he was not going to look for someone to supervise the visit on short notice. Magana also testified to numerous other occasions when Ramirez missed or cancelled visits with Aria.

Some of the disputes regarding Ramirez' parenting time led to the involvement of law enforcement. Hall County Sheriff's Deputy Dan Niemoth had two such contacts with Magana and Ramirez in February and April 2023. During the first interaction in February, Magana refused to

allow Aria to leave with Ramirez for his scheduled parenting time because Magana did not recognize the names of the persons that Ramirez claimed would provide supervision for the visit. Despite Magana's objection to Ramirez' proposed supervisors, Niemoth indicated that both Magana and Ramirez were polite and cooperative during his interaction with them.

During Niemoth's second interaction with the parties in April 2023, Ramirez, his mother Maria, and his stepfather, arrived at Magana's home to pick up Aria, but Ramirez claimed that when Ramirez' mother went up to the residence to pick up Aria, Magana left in her vehicle with Aria. Magana disputed this version of events stating that on this occasion, she believed that Maria was going to contact her to arrange a location to pick up Aria and when Maria did not do so, Magana "figured they didn't want to see Aria." She further disputed Ramirez' testimony that she left in her car that day stating, "I never saw them that day. I wasn't home."

### (d) Communication Between Parties

Ramirez testified that he used to attend 90 percent of Aria's doctor's appointments, but since the parties' separation, Magana failed to notify him of Aria's doctor or dentist visits or inform him of medical issues regarding Aria. Magana testified that she did not know that Ramirez wanted to be informed every time Aria had a checkup, and she had no problem advising him of medical appointments utilizing the parenting app once they began using the app in September 2023.

Ramirez also stated that Magana "banned" him from attending Aria's soccer practices, but later admitted that Magana never told him that he could not attend Aria's practices. Conversely, Ramirez testified that Aria takes horseback riding lessons every Wednesday during the fall, spring, and summer, and that he notified Magana of the schedule and stated that "[s]he [was] more than welcome" to attend. He also testified that more recently, Magana failed to notify him of gymnastic events. Although acknowledging that in January 2023, Magana notified him that she had signed Aria up for gymnastics, requested that he pay for one-half of the cost, and said that he would be able to attend practices, Ramirez stated that Magana never told him where the gymnastics practices were held, but admitted he never asked her for the location because Magana had "banned" him from attending. He stated that more recently Magana informed him that for her second year, Aria had been placed on a waiting list for gymnastics.

He also testified that Magana "banned" him from attending Aria's kindergarten lunchtime, which he had previously enjoyed attending. Magana denied telling the school not to allow Ramirez to visit.

### (e) Best Interests

#### (i) Magana

Magana testified that after Aria's birth she stayed home with her for 12 weeks and that she has been Aria's primary caregiver since Aria's birth. She stated that she and Aria reside in a 2-bedroom apartment, and at her home, Aria's evening routine involves Magana giving Aria a bath, reading a book, and having Aria in bed by 9 p.m. Magana further testified that keeping Aria in a routine is in Aria's best interests.

Magana acknowledged that Aria enjoys spending weekends with Ramirez, especially horseback riding lessons, and that she wanted Aria to be able to travel with Ramirez for vacations "as long as there's enough notice for adjustments for Aria." She testified that 30 days' notice was

reasonable for taking Aria either out of the state or out of the country, but that she could be flexible if Ramirez gave her 2 or 3 weeks' notice.

Magana testified that she believes Ramirez' schedule is an obstacle to sharing equal parenting time with Aria because Ramirez' routine with his current job was to work from 7 a.m. to 5 p.m., go to the gym after work, spend time helping his brother remodel a house, and not return home until 11 p.m. or 12 a.m. Magana stated that her ideal parenting time schedule for Ramirez would be every other weekend from Friday after school until Sunday evening and every Wednesday from after school until 8 p.m. Magana testified that she believed that it was in Aria's best interests for Ramirez' Wednesday night visits to run from after school until 7 or 8 p.m., because when she stays overnight, Ramirez wakes her up at 6 a.m. to return her to Magana's home, making Aria "sleepy" and "whiny."

Finally, Magana testified that she does not believe that Ramirez is a bad parent but that "[h]e just doesn't know how to parent." She also stated that even though she believed that Ramirez is a fit parent, he should not have equal time with Aria because

> I was the one that always cooked for her and bathed her. He never did any of that stuff. I don't know if he is capable of doing that. . . . I mean he worked all of the time, so Aria was with me.
>
> Any time she goes with him, she tells me that they're not at his house, they're always doing something. Like Aria is five. She needs stability. She needs a routine. From what Aria tells me, there's none of that.

### (ii) Ramirez

Ramirez, on the other hand, testified that he shared in parental duties equally and that a typical day during the first few years of Aria's life involved him changing her diaper, cuddling her, hugging her, watching tv together, having dinner together, and putting her to bed. He also testified that the parties shared responsibility for getting up with Aria during the night.

Ramirez testified that he would like to have his visits with Aria on Wednesdays to allow for him to pick her up after school and to extend overnight. He further stated that, although he usually goes to work at 7 a.m., his hours are flexible. He further testified that his home is clean and safe, that Aria has her own room, and that she has everything she needs including clothes and toys. He described his relationship with Aria as "superb" and stated that his current parenting time of 2 hours on Wednesdays and every other weekend was an insufficient amount of time with Aria.

Ramirez testified that he currently felt isolated from Aria and that Aria sees and understands the isolation, which was devastating to him because Aria was "traumatized over the events that [Magana] has caused." He further stated that Aria never asks him to stay longer because "she has learned that [Magana] is the dictator." He also expressed that he believed that Magana had interfered with his relationship with Aria, which has traumatized Aria and was not in Aria's best interests. However, Ramirez admitted that Aria loves both him and Magana, opined that it was in Aria's best interests for the parties to have joint legal and physical custody, and stated that awarding him equal time with Aria would help her have an "above average life" with him.

(f) Testimony From Other Individuals

*(i) Marcus Shupe*

Marcus testified that he and Magana are coworkers and between 2012 and 2014, he shared a residence with Magana and Ramirez. He testified that he never witnessed any domestic violence between the parties, and he did not have any concerns about either party's character. He further testified that he witnessed both Ramirez and Magana parent Aria and he did not have any concerns about their parenting and believed that they were both capable of making appropriate decisions. Marcus further testified that in the 6 months to 1 year prior to the trial, he supervised one or two of Ramirez' visits with Aria and during those visits, he did not witness anything that caused him concern. He further testified that Ramirez cares for Aria, loves her, and cares for her needs. He further expressed that Aria seemed to be happy when she was around Ramirez.

*(ii) Cynthia Mendez*

Cynthia testified that she has known Ramirez and Magana for approximately 15 years, she supervised Ramirez' parenting time approximately 4 times, and that she did not have any concerns relating to Ramirez' parenting. Based upon her observations, Cynthia expressed that she did not have any concerns with Ramirez' parenting style; that she never heard him speak negatively about Magana in front of Aria; that Ramirez has a positive relationship with Aria; and that Aria and Ramirez love and care for each other. She further testified that she had no concerns about Ramirez' ability to care for Aria or Ramirez' ability to follow court orders.

*(iii) Edgar Ramirez*

Ramirez' brother, Edgar, testified that he supervised "a lot" of Ramirez' visits with Aria. He also stated that on some of the days that he was supposed to supervise visits between Ramirez and Magana, Magana refused to allow Ramirez to take Aria for his parenting time, which made Ramirez hurt and upset, but Ramirez never became violent or swore at Magana. However, he later admitted that on one occasion Ramirez did scream when Magana did not allow him parenting time with Aria. He further testified that when he supervised Ramirez' visits with Aria, Magana has allowed Ramirez to have extra time with Aria.

Edgar expressed that Ramirez loves Aria and is a good father and that he does not have any concerns about Ramirez' ability to parent Aria. He further testified that he never witnessed any domestic violence between Ramirez and Magana. Edgar acknowledged that he respects Magana and that she is a good mother, that both she and Ramirez want what is best for Aria, and he expressed that he believed it was in Aria's best interests to have equal time with Ramirez.

*(iv) Maria Pantoja*

Ramirez' mother, Maria, testified that she has known Magana for over 15 years and that she supervised 6 or 7 of Ramirez' visits with Aria. During those visits, Maria expressed that she did not have any concerns regarding Ramirez' parenting and that Aria and Ramirez had a good and loving relationship. Maria noted that Magana did not make Aria available for Ramirez' parenting time a few times, which made Ramirez upset, but he did not become violent. However, other times, Magana allowed Ramirez extra parenting time.

She further testified that both Magana and Ramirez are good, responsible parents and she has no concerns about either party's ability to care for Aria. However, she expressed that Ramirez deserves more time with Aria and that equal time with each parent is in Aria's best interests.

### (v) Carlie Morse

Ramirez' current girlfriend, Carlie, testified that she observed Ramirez with Aria, that Ramirez loves Aria, and that she has no concerns about Ramirez' ability to parent Aria. She denied that Ramirez had spoken negatively about Magana in front of her or Aria. She further testified that she wanted the court to know that

> since I have known [Ramirez,] he has had [Aria's] best interests to the full extent. He is just always willing to . . . provide for her and do what's best for her. I know he loves her very deeply.
>
> Just the relationship that I have witnessed around them, they have a really close bond. I know there have been a few times when [Aria] went to go to leave, . . . she was not wanting to leave. She gets sad sometimes. I just want the best for both of them.

She also stated that Ramirez wants more time with Aria and that she believed that would be beneficial to their relationship.

### (vi) Manuella Palomares

Manuella testified that she is Ramirez' friend and that she supervised one of Ramirez' visits with Aria. During that visit, she had no concerns with Ramirez' ability to parent Aria and she believed that Ramirez and Aria had a good relationship. She testified that she believed that Ramirez is a good father and that he wants more time with Aria. Manuella further testified that she has also observed Magana with Aria and that she did not have any concerns with Magana's ability to parent Aria.

### (vii) Marayah Ramirez Pantoja

Marayah testified that she is Ramirez' sister and she supervised several of Ramirez' visits with Aria. She testified that during exchanges, there were several times when Magana would not release Aria for the visits. Marayah expressed that she had no concerns regarding Ramirez' ability to parent Aria and she had never seen him be violent toward Magana. She expressed that Magana and Ramirez are good parents and deserve equal time with Aria.

### 6. DISTRICT COURT ORDER

In February 2024, the court entered its final order finding that Ramirez was Aria's legal and biological father and awarded the parties joint legal custody with Magana granted final decision making authority if the parties were unable to agree. The court also awarded the parties joint physical custody of Aria with the principal place of residence being Magana's home with weekly exchanges. In setting forth its reasoning, the court stated:

> Since the end of their relationship, tensions have been high between Ramirez and Magana. At the inception of the case, significant concerns were raised regarding Ramirez's mental health and residential stability. The evidence presented establishes that Ramirez currently has, and has maintained through the case, a residence . . . in Grand Island. In

addition, Exhibits 20, 22, and 23 corroborate his own testimony that any mental health issues which may have been present implicating his ability to be a fit parent at the beginning of this case have been remedied. As such, the Court finds that both Ramirez and Magana are fit and suitable parents for Aria.

. . . .

The only area of concern for the Court centers around the obvious and continuing animosity between Ramirez and Magana displayed in his words and actions throughout this matter, the text messages contained within Exhibit 30, and his tone and demeanor during the final hearing. Aria deserves to have two parents actively involved in her life, both focusing *solely* on her best interests. The focus of each party needs to be Aria's future. The past relationship issues between Ramirez and Magana must stay in the past in order for each parent to be able to effectively co-parent with the other.

As the Court admonished at the final hearing, the words and tones used to interact with each other matter. If such negative word choice, name calling, and aggressive conversation tactics are continued to be used by Ramirez, a future co-parenting relationship will not be successful. For example, the posting of videos of Magana on social media sites in a negative tone is immature and [counterproductive] to both a positive co-parent relationship between the parties as well as a productive full and future relationship with Aria. This order shall be unambiguous notice to Ramirez that he needs to choose either the path of a respectful co-parenting relationship with Magana for [Aria's] best interests or continued bullying of Magana serving no interest of Aria demonstrating his inability to co-parent requiring . . . significantly less than [a] joint custody relationship.

Magana has timely appealed to this court.

## III. ASSIGNMENTS OF ERROR

Magana's assignments of error, consolidated and restated, are that the district court erred in (1) improperly applying a de facto presumption of shared custody rather than the appropriate standard of best interests of the child in its custody determination; (2) finding that the evidence of Ramirez' mental health issues had been remedied at the time of trial and did not bear on the issue of custody; (3) ordering joint physical custody despite finding that Ramirez displayed "bullying" behaviors up to and during the trial and Ramirez' disrespectful demeanor during the trial instead using the decree to provide "notice" to Ramirez that his continued "bullying" of Magana would demonstrate an inability to coparent and would require a "significantly less than joint custody arrangement"; and (4) finding that joint physical custody was in Aria's best interests.

## IV. STANDARD OF REVIEW

In a filiation proceeding, questions concerning child custody determinations are reviewed de novo on the record to determine whether there has been an abuse of discretion by the trial court, whose judgment will be upheld in the absence of an abuse of discretion. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). In such de novo review, when the evidence is in conflict, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

## V. ANALYSIS

### 1. STANDARD FOR CUSTODY DETERMINATIONS

Magana first contends that the district court erred by improperly applying a de facto presumption of shared custody rather than the appropriate standard of best interests of the child in its custody determination.

We agree with Magana that there is no de facto presumption of shared custody in Nebraska. Joint physical custody is neither favored nor disfavored under Nebraska law. *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). In fact, no custody or parenting time arrangement is either favored or disfavored as a matter of law. *Id*. However, we reject Magana's claim that the district court applied a de facto presumption of shared custody. The district court's order specifically found "that it is in the best interests of Aria" for Magana and Ramirez to share joint physical custody and documented the court's corresponding rationale. The court further noted that continued issues with the parties' ability to be respectful and coparent may warrant a future change in custody. The court's factual and legal findings related to the joint physical and legal custody award refute Magana's claim that the court applied a de facto presumption of joint custody. Accordingly, this assignment of error fails.

### 2. RAMIREZ' MENTAL HEALTH ISSUES

Next, Magana contends that the district court erred in finding that the evidence of Ramirez' mental health issues had been remedied at the time of trial and did not bear on the issue of custody. We note that the district court's order stated that "[a]t the inception of the case, significant concerns were raised regarding Ramirez' mental health . . . Exhibits 20, 22, and 23 corroborate his own testimony that any mental health issues which may have been present implicating his ability to be a fit parent at the beginning of the case have been remedied." We read Magana's assignment and argument to mean that the evidence did not support the court's finding that Ramirez was fit to share joint custody of Aria with Magana at the time of trial due to issues with his mental health.

As we read the record, the only "mental health issues" identified for Ramirez was acute depression following his separation from Magana and Aria, and associated insomnia. And it was clear that the district court initially had concerns with Ramirez' condition, which concerns were noted in the court's initial temporary orders. But after reviewing the evidence at the time of trial, the court found that with therapy, Ramirez had resolved the issue that led to the court's initial concerns and found that Ramirez was fit to share joint custody of Aria with Magana. Magana argues that the evidence relied upon by the court was not sufficient to demonstrate that Ramirez' "mental health issues" had been resolved. More specifically, Magana argues that exhibits 20, 22, and 23 were largely based upon Ramirez' self-reporting and that "[e]xhibit 20 [the July 2023 mental health evaluation] itself is rife with intrinsic evidence of Ramirez' ongoing and untreated mental health issues, as well as the credibility of the testimony the Court found the exhibit corroborates." Brief for appellant at 16.

Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Tilson v. Tilson*, 307 Neb. 275, 948 N.W.2d 768 (2020). Evidence of unfitness should be focused upon a parent's ability to care

for a child, and not any other moral failings a parent may have. *Id*. Evidence of a parent's past failings is pertinent insofar as it suggests present or future faults. *Id*. And in assessing parental fitness, an appellate court may consider a parent's ability to meet the particular needs of a child. *Id*.

In our de novo review of this record, we find there is no evidence in the record of any continuing mental health issues associated with Ramirez other than early acute depression and insomnia and no indication from any medical providers that the condition persisted or would impact Ramirez' fitness to parent his child. We further note that exhibits 20, 22, and 23 were only a portion of the evidence related to Ramirez' mental health. Magana did not object to Ramirez' July 2023 mental health evaluation and although she argues on appeal that Ramirez' "mental health issues" have not been remedied, she admitted that Ramirez was fit to parent Aria. Further, in addition to the medical evidence provided by Ramirez at trial, other witnesses testified that Ramirez was a fit parent, and that Ramirez was capable of caring for Aria and meeting her needs.

Acknowledging that the district court had the opportunity to review the evidence and heard and observed the witnesses' testimony, whereas this court is limited to a review of the cold record, we give weight to the fact that the trial court determined that any mental health issues experienced by Ramirez did not preclude his ability for joint physical custody of Aria. This assignment of error fails.

### 3. RAMIREZ' BULLYING AND DISRESPECTFUL DEMEANOR

Third, Magana contends that the district court erred in ordering joint physical custody despite finding that Ramirez displayed "bullying" behaviors up to and during the trial and erroneously utilized the decree to provide "notice" to Ramirez that his continued "bullying" of Magana would compromise the joint award and would require a "significantly less than joint custody arrangement." Brief for appellant at 3 and 23.

The record presents a picture of how Ramirez has evolved since the beginning of his separation from Magana. He initially suffered from depression and insomnia and sought counseling to assist him. Also, following his separation, Ramirez apparently suffered from anger and resentment issues and lashed out verbally for what he perceived was the cause of the deteriorated relationship. This unacceptable behavior resulted in legal consequences, including but not limited to, the issuance of a protection order in March 2023. But the record also reflects that Ramirez made behavioral strides and that Ramirez remained a loving, nurturing, and caring parent to Aria and he was described as a fit parent by his own family, friends, and Magana. And although his behavior towards Magana is troubling, his ability to communicate with her improved over time as he moved on from his prior relationship with Magana and entered into a new one which he described as impactful and healthy. The issue presented is whether it was in the best interests of Aria to have a joint custody arrangement with both parents as of the time of trial. And as Magana points out in her brief, notwithstanding Ramirez' parental fitness, conduct towards a child which tends to poison the child's mind against, and alienate his affection from his mother or father is so inimical to the child's welfare as to be grounds for denial of custody or a change of custody from the party guilty of such conduct. See *Hossack v. Hossack*, 176 Neb. 368, 126 N.W.2d 166 (1964).

The district court clearly took into consideration that Ramirez had engaged in past behaviors that caused the court concern; however, it is also evident the court did not find such past

behaviors to necessarily be indicative of how Ramirez will parent moving forward based upon his personal evolution during the course of the proceedings. And to the extent Ramirez ignores what this court views as cautionary language contained in the district court's order, and instead continues to engage in disrespectful or alienating behaviors that adversely influence Aria, such matters can be addressed in subsequent proceedings. The district court indicated that notwithstanding Ramirez' personal evolution over the course of these proceedings, Ramirez still presented with tendencies to lash out at Magana, which could result in a future change in custody. The district court's decision reflects its belief that Ramirez will curtail that aspect of his prior behavior and will have the ability to parent Aria in a positive manner henceforth, including, for the sake of the healthy development of Aria, demonstrating respect for Magana and her family.

While the record indicates that both Ramirez and Magana love Aria, it is clear that they have a contentious relationship with each other. While this court does not, and will not, condone any bullying or disrespectful behavior, after conducting a de novo review of the evidence, we find that the parties have been able to effectively communicate as evidence by their successful use of the parenting app in the beginning of 2023. And, if both parties place Aria's best interests before their feelings toward each other, they will be able to successfully coparent while sharing joint physical custody of Aria. As such, we find no abuse of discretion regarding the court's determination that Ramirez is capable and will curtail his behavior toward Magana and is fit for a joint custody relationship with Magana. This assignment of error fails.

#### 4. Correctness of Joint Physical Custody Determination

Finally, Magana contends that the district court abused its discretion in finding that joint physical custody was in Aria's best interests.

Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) provides:

In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member . . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse. For purposes of this subdivision, the definitions in section 43-2922 shall be used.

In addition to the "best interests" factors listed in § 43-2923, a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and

- 13 -

stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

"Joint physical custody means mutual authority and responsibility of the parents regarding the child's place of residence and the exertion of continuous blocks of parenting time by both parents over the child for significant periods of time." Neb. Rev. Stat. § 43-2922(12) (Cum. Supp. 2022). However, Nebraska statutes do not require the district court to grant equal parenting time or joint custody to the parents if such is not in their children's best interests. See *Kamal v. Imroz*, 277 Neb. 116, 759 N.W.2d 914 (2009). Neb. Rev. Stat. § 42-364(3) (Cum. Supp. 2024) provides:

> Custody of a minor child may be placed with both parents on a . . . joint physical custody basis . . . (a) when both parents agree to such an arrangement in the parenting plan and the court determines that such an arrangement is in the best interests of the child or (b) if the court specifically finds, after a hearing in open court, that joint physical custody . . . is in the best interests of the minor child regardless of any parental agreement or consent.

Based upon our de novo review of the record, we find that both parties obviously love Aria, both have strong relationships with her, and both want what is best for Aria. Both parties provided physical care for Aria prior to the custody proceedings, although we recognize that Magana was Aria's primary caregiver. The record shows that both parties are healthy and are able to provide appropriate homes for Aria and to meet her physical, emotional, and educational needs. Although Aria is too young to express a preference for who to live with, we note that Aria appears to be a happy and well-adjusted child who loves both of her parents. Although the record does not disclose any physical abuse between the parties, we are concerned about Ramirez' rude behavior toward Magana and Magana's allegations that Ramirez makes statements around Aria that are meant to negatively affect Aria's relationship with Magana.

We acknowledge and applaud Magana's efforts to foster Aria's relationship with Ramirez despite the parties' strained relationship and we encourage Ramirez to likewise acknowledge Magana's efforts and to respond similarly, positively to her. In this court's opinion, although the parties have had difficulty communicating in the past, their love for Aria will enable them to successfully coparent while sharing joint physical custody and that joint physical custody is in Aria's best interests. Although we find that Magana's assignment of error fails, we remind Ramirez of the district court's admonition that

> [t]his order shall be unambiguous notice to Ramirez that he needs to choose either the path of a respectful co-parenting relationship with Magana for [Aria's] best interests or continued bully[ing] of Magana serving no interest of Aria demonstrating his inability to co-parent requiring . . . significantly less than [a] joint custody relationship.

## VI. CONCLUSION

Having considered and rejected Magana's assignments of error, we affirm the order of the district court in its entirety.

AFFIRMED.